**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────

**No. 22-1573**

─────────

CLARY HOOD, INC.,

　　　　　Petitioner - Appellant,

　　v.

COMMISSIONER OF INTERNAL REVENUE,

　　　　　Respondent - Appellee.

─────────

Appeal from the United States Tax Court.  (Tax Ct. No. 3362-19)

─────────

Argued:  March 7, 2023　　　　　　　　　　　　　　Decided:  May 31, 2023

─────────

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

─────────

Affirmed in part, vacated in part, and remanded by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Wilkinson and Judge King joined.

─────────

**ARGUED:**  Raboteau Terrell Wilder, II, WILDER PANTAZIS LAW GROUP, Charlotte, North Carolina, for Appellant.  Robert Joel Branman, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  William Curtis Elliott, Jr., Stanton Paul Geller, CULP ELLIOTT & CARPENTER, P.L.L.C., Charlotte, North Carolina, for Appellant.  David A. Hubbert, Deputy Assistant Attorney General, Bruce R. Ellisen, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

─────────

NIEMEYER, Circuit Judge:

In this appeal, we review the U.S. Tax Court's disallowance of a portion of a corporation's business deduction for bonuses paid to the corporation's CEO, as well as the court's imposition of a penalty.

Clary Hood, Inc. ("Hood, Inc."), a South Carolina corporation engaged in land excavation and grading, with revenue of $44 million in 2015 and $69 million in 2016, paid its CEO a $5 million bonus in both of those years, deducting the payments on its income tax returns as reasonable business expenses under 26 U.S.C. § 162(a)(1). Following an audit, the Internal Revenue Service ("IRS") contended that the bonuses were excessive, with the excess amount actually representing a disguised payment of dividends from profits, which could not be deducted. The Tax Court mostly agreed with the IRS and determined that Hood, Inc. could only deduct roughly $3.7 million for 2015 and $1.4 million for 2016 as reasonable amounts for total compensation to its CEO. Accordingly, it assessed tax deficiencies for both years in the total amount of roughly $1.96 million, as well as a penalty for 2016 in the amount of $282,398.

On appeal, we affirm the Tax Court's findings with respect to the amount of reasonable deductions and consequent tax deficiency but vacate the imposition of the penalty.

I

Hood, Inc. was founded in 1980 as a subchapter C corporation, and during the period relevant to this appeal, Clary Hood and his wife, Gail Hood, each owned 50% of the

2

company's stock. They were also the only members of its board of directors, and Mr. Hood served as the company's CEO. From 2000 to 2010, the company averaged approximately $21 million in revenue, earning an average of less than $1 million each year in net income before taxes. Seeking to increase revenue, Mr. Hood decided in 2011 to pivot the company away from retail-related projects to other commercial and industrial projects, and this decision proved to be especially astute. Revenues immediately increased, and by 2015, the company's revenue had grown to $44 million and by 2016, to $69 million. Net income before taxes also increased, as did cash and cash equivalents. The company also grew in size during this period, from approximately 80 employees in 2011 to approximately 150 employees in 2016.

The Tax Court recognized the significance of Mr. Hood's various contributions, crediting mostly him with the success of Hood, Inc.

For the years 2000 to 2010, Hood, Inc. paid Mr. Hood an annual salary of roughly $130,000. In some of those years Mr. Hood also received a bonus in addition to his salary, with the largest bonus amounting to $320,981. As the company's only board members, Mr. and Mrs. Hood set Mr. Hood's salary and bonuses. In 2013, Hood, Inc. began to increase Mr. Hood's salary and bonuses, and for 2013, it paid him a salary of $381,707 and a $1 million bonus, and for 2014 it paid him a salary of $181,538 and a $1.5 million bonus.

During the company's fiscal year ending May 31, 2015, in which the company realized significant growth, Hood, Inc.'s Chief Financial Officer ("CFO") began an assessment of Mr. Hood's past compensation, and he concluded that in prior years, Mr. Hood had been undercompensated. To determine how much to compensate Mr. Hood for

3

the 2015 fiscal year and the years thereafter, the CFO sought the advice of the company's accountants at Elliott Davis Decosimo, LLC ("Elliott Davis"). The record is not clear to what extent Mr. Hood participated in this assessment. But, as the Tax Court noted, Mr. Hood later acknowledged "that he was aware that he needed to start making necessary preparations from an 'income tax' perspective in 'getting money out of' the company in anticipation of 'a changing of the guard.'" After meeting with the company's accountants, Hood, Inc.'s CFO determined that Mr. Hood had been undercompensated since 2000 and that the total amount that would both remedy that past undercompensation and recognize Mr. Hood's service for the 2015 year was $7.1 million. The CFO thus suggested that Hood, Inc. pay Mr. Hood a $5 million bonus in 2015, some portion of which was to remedy past undercompensation, with the balance of the undercompensation amount to be paid in "future years." The company's accountants gave their approval to this suggestion and concluded that the CFO's proposal was "reasonable." Accordingly, at the meeting of Hood, Inc.'s board of directors, Mr. and Mrs. Hood approved paying Mr. Hood a $5 million bonus, in addition to Mr. Hood's $168,559 salary. The minutes of that meeting explained that the bonus was approved in recognition of Mr. Hood's "many years of sacrificial work done on the Company's behalf."

The following year, after Hood, Inc. went through the same process as it did for determining the bonus for the 2015 fiscal year, Mr. and Mrs. Hood as board members again approved a bonus to Mr. Hood of $5 million for the 2016 fiscal year, again in addition to Mr. Hood's salary, which in 2016 was $196,500.

Despite substantial retained earnings and cash, however, Hood, Inc. did not consider paying any dividends to its two shareholders, *i.e.*, Mr. and Mrs. Hood. Indeed, the company had never paid any dividends.

Following an audit of Hood, Inc.'s federal income tax returns, the IRS issued a notice of deficiency to the company for its 2015 and 2016 tax years, finding that a substantial portion of Mr. Hood's compensation was excessive and therefore not deductible under 26 U.S.C. § 162(a) as reasonable compensation for services rendered. It calculated tax deficiencies for 2015 and 2016 to be roughly $1.6 million for each year. Additionally, the IRS determined that the company was liable for a 20% penalty for each year because the company's understatements of income tax were "substantial."

Hood, Inc. then filed a petition with the Tax Court for a redetermination of the tax deficiencies and underpayment penalties. During a six-day trial, the Tax Court heard from fact witnesses regarding the important role that Mr. Hood played in growing the company and increasing its revenues, as well as the process that Hood, Inc. followed in determining Mr. Hood's bonuses for the 2015 and 2016 fiscal years. And both the company and the IRS presented expert testimony.

The IRS's expert, David Fuller, agreed that Mr. Hood was undercompensated for the period of 2000 to 2012 but found that Hood, Inc. had started to remedy this condition beginning with its payment of approximately $1.4 million in total compensation to Mr. Hood in 2013. Based on survey data of compensation paid to other similarly situated executives, the specific characteristics of Hood, Inc., and Mr. Hood's contributions, Fuller concluded in his report that Mr. Hood was undercompensated in total by approximately

$2.3 million as of May 31, 2014. Taking this undercompensation amount into account, as well as interest on that amount, Fuller concluded that the total reasonable compensation amounts for Mr. Hood would be $3,681,269 for 2015 and $1,362,831 for 2016, and that any amounts above those figures constituted excess or "unreasonable" compensation.

Hood, Inc. submitted two expert reports, but the Tax Court afforded them "little to no weight" based on the "dubious assumptions" underlying the reports and the lack of supporting calculations.

In its thorough 64-page opinion, the Tax Court accepted Fuller's calculations and thus found that the amounts deductible as reasonable compensation to Mr. Hood for his services were $3,681,269 for 2015 and $1,362,831 for 2016. The court did not impose a "substantial underpayment" penalty under 26 U.S.C. § 6662 for 2015, finding, pursuant to 26 U.S.C. § 6664, that the company had established a reasonable-cause defense to any penalty for that year because it reasonably relied on professional tax advice in good faith. But the court found that the company had not established the same defense for 2016, and therefore it sustained the imposition of a penalty for that tax year.

The Tax Court entered its final decision on May 12, 2022, finding that Hood, Inc. was liable for a $550,866 income tax deficiency for 2015 and a $1,411,991 deficiency for 2016. It also imposed a penalty of $282,398 for 2016. From the Tax Court's decision, Hood, Inc. filed this appeal, challenging both the tax deficiencies and the penalty.

6

II

The Internal Revenue Code allows a taxpayer to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including . . . a *reasonable* allowance for salaries or other compensation *for personal services actually rendered*." 26 U.S.C. § 162(a)(1) (emphasis added). IRS regulations explain further that, in order to be deductible as an ordinary business expense, compensation "may not exceed what is reasonable *under all the circumstances*," taking into account "such amount as would ordinarily be paid for like services by like enterprises under like circumstances." 26 C.F.R. § 1.162-7(b)(3) (emphasis added). And any bonuses paid similarly must not exceed what is reasonable for the services rendered in order to be deductible as an ordinary business expense. 26 C.F.R. § 1.162-9.

In cases that involve "a closely held corporation whose controlling shareholders set their own level of compensation, the reasonableness of the compensation paid to the shareholder-employee is subject to close scrutiny." *Dexsil Corp. v. Comm'r*, 147 F.3d 96, 100 (2d Cir. 1998). This scrutiny is warranted because such corporations may more readily choose to pay out larger salaries and bonuses, which are deductible by the corporation under § 162(a), rather than pay dividends from profits, which are not. *Id.* Thus, if some portion of the ostensible salary or bonus paid to a shareholder-employee is in fact a disguised dividend, rather than compensation for services rendered, it is not deductible. 26 C.F.R. § 1.162-7(b)(1). For these reasons, the close scrutiny to which closely held corporations are subject should focus on whether bonuses paid to shareholder-employees are compensation for only services actually rendered — which would make the payment

7

deductible — or are the corporation's effort to transfer profits to the shareholder-employees — which would not be deductible and therefore would have the effect of increasing the corporation's tax liability.

To make this determination, we apply a standard of reasonableness "under all the circumstances," taking into account practices and payments "by like enterprises under like circumstances." 26 C.F.R. § 1.162-7(b)(3). This, we conclude, calls for application of a multifactor approach that assesses the reasonableness of compensation under the totality of the circumstances. *See, e.g., Charles Schneider & Co. v. Comm'r*, 500 F.2d 148, 151–52 (8th Cir. 1974); *Kennedy v. Comm'r*, 671 F.2d 167, 173–74 (6th Cir. 1982); *Elliotts, Inc. v. Comm'r*, 716 F.2d 1241, 1245 (9th Cir. 1983); *B.B. Rider Corp. v. Comm'r*, 725 F.2d 945, 952 (3d Cir. 1984); *Owensby & Kritikos, Inc. v. Comm'r*, 819 F.2d 1315, 1323 (5th Cir. 1987); *Dexsil Corp.*, 147 F.3d at 100; *Eberl's Claim Serv., Inc. v. Comm'r*, 249 F.3d 994, 999 (10th Cir. 2001); *Haffner's Serv. Stations, Inc. v. Comm'r*, 326 F.3d 1, 3–5 (1st Cir. 2003). As we have previously explained, albeit in an unpublished opinion, under the multifactor approach, no single factor is decisive, but rather we consider numerous factors, such as

> the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with gross income and net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; [and] the salary policy of the taxpayer as to all employees.

*Richlands Med. Ass'n v. Comm'r*, 953 F.2d 639, 1992 WL 14603, at *2 (4th Cir. 1992) (unpublished) (per curiam) (quoting *Owensby & Kritikos, Inc.*, 819 F.2d at 1323). And in

8

the context of small corporations that have a limited number of officers, additional factors may be considered, such as the amount of compensation paid to the officer in previous years, *see Mayson Mfg. Co. v. Comm'r*, 178 F.2d 115, 119 (6th Cir. 1949), and whether the officer personally guaranteed debts or other obligations of the corporation, *see Owensby & Kritikos, Inc.*, 819 F.2d at 1325 n.33. Moreover, we find appropriate the suggestion of some other courts of appeal that the various relevant factors may be reviewed through the "lens" of, *Dexsil Corp.*, 147 F.3d at 101, or "from the perspective of," a hypothetical independent investor by asking "whether [such an] investor would be willing to compensate the employee as he was compensated," *Elliotts, Inc.*, 716 F.2d at 1245.

Hood, Inc. contends that because we have not formally adopted the multifactor test, the Tax Court erred in applying it here and that we should consider the adoption of a singular "independent investor" test, which establishes a rebuttable presumption that an executive's compensation is reasonable if the corporation's shareholders are receiving a sufficiently high rate of return on their equity investment. *See Menard, Inc. v. Comm'r*, 560 F.3d 620, 622–23 (7th Cir. 2009); *Exacto Spring Corp. v. Comm'r*, 196 F.3d 833, 839 (7th Cir. 1999). Hood, Inc. reasons that under that test we should approve Mr. Hood's bonuses because Hood, Inc. generated a 22% return on equity for its shareholders in 2015 and a 36% return in 2016 after accounting for Mr. Hood's total compensation.

While it might be reasonable to consider the Seventh Circuit's independent investor test along with other factors relevant to the totality of the circumstances, we conclude that solely using that test to establish a presumption of reasonableness, as Hood, Inc. urges, would be too narrow in light of the regulatory demand that we consider "what is reasonable

9

under all the circumstances." 26 C.F.R. § 1.162-7(b)(3). For instance, under the independent investor test, an executive's compensation could be presumed to be reasonable even if it exceeded the amount that was genuinely compensation "for personal services actually rendered," 26 U.S.C. § 162(a)(1), and that "would ordinarily be paid for like services by like enterprises under like circumstances," 26 C.F.R. § 1.162-7(b)(3). By contrast, the multifactor test allows for consideration of the numerous other relevant factors. Accordingly, we conclude that it is the appropriate test to apply and that the Tax Court did not err in applying it here.

III

Finding no legal error in the Tax Court's use of the multifactor approach, we review the Tax Court's findings made under that test for clear error. *See Miles-Conley Co. v. Comm'r*, 173 F.2d 958, 960 (4th Cir. 1949).

Hood, Inc. contends that the Tax Court did not adequately account for the return on equity generated for the company's shareholders; that it did not appropriately credit Mr. Hood's extraordinary performance and recognize that such performance could justify compensation in excess of the norm; and that it placed too much emphasis on the comparison of Mr. Hood's compensation with that of similarly situated executives in the industry. These arguments, however, simply raise questions regarding the weight to assign the factors, as the Tax Court considered them among the many factors it addressed in its extensive opinion.

10

As a starting point, the Tax Court recognized that Mr. Hood was "extraordinarily talented in his industry," served as the company's "key employee and driving force from its inception," and that the company's business of land excavation and grading was "more complex than that of a general construction company." The court also acknowledged that the trend of Hood, Inc.'s increasing revenue, culminating with an annual revenue of roughly $69 million in 2016, "[could] not be credited to economic conditions alone" and that Mr. Hood was instrumental in transitioning the business to more profitable projects. The court took account of these factors as well as others in its opinion, allowing reasonable compensation to Mr. Hood for his personal services in this regard.

The Tax Court also recognized that it was permissible for Hood, Inc. to compensate Mr. Hood for undercompensation in prior years, as explained in *Alpha Medical, Inc. v. Commissioner*, 172 F.3d 942, 950 (6th Cir. 1999). In *Alpha Medical*, the court noted that "[a] taxpayer making such a claim must show: (1) the insufficiency of the officer's compensation in the previous year[s]; and (2) the amount of the current year's compensation that was intended as compensation for that underpayment." 172 F.3d at 950. Thus, the Tax Court agreed with Mr. Hood that he was entitled to some degree of additional compensation for the services rendered in prior years.

But, focusing in large part on comparative compensation paid by relevant enterprises, as required by regulation, the court did not agree that a $5 million bonus was appropriate for either year, even when including amounts for previous undercompensation as well as a bonus for the current year. In reaching that conclusion, the court pointed to several relevant factors that indicated overpayment.

11

First, the court noted that Hood, Inc. had never declared or paid a cash dividend to its shareholders, even after it began to accumulate significant capital during the period from 2013 to 2016. Although companies are not required to pay dividends, a court may nonetheless consider a profitable corporation's failure to do so in determining the reasonableness of compensation paid to its shareholder-employees. *See Miles-Conley Co.*, 173 F.2d at 960; *see also Paul E. Kummer Realty Co. v. Comm'r*, 511 F.2d 313, 315 (8th Cir. 1975). In this case, the Tax Court agreed that Hood, Inc. had advanced persuasive reasons for not declaring dividends for many years, such as 2010, when business was slow and capital needs were high. It also recognized, as Hood, Inc. pointed out, that Hood, Inc.'s business was capital-intensive due to the cost of obtaining and maintaining heavy equipment. But the court noted that this rationale became less persuasive in later years given that Hood, Inc.'s year-end shareholder equity value had increased nearly sixfold, from approximately $5.5 million in 2010 to over $31 million in 2016. Yet the company opted to pay out large bonuses to Mr. Hood rather than paying any dividends. And the lack of dividends became especially suspect in light of Mr. Hood's testimony that in 2015, he was aware that he needed to start making preparations from an "income tax" perspective for "*getting money out of [the] corporation*" in preparation for "a changing of the guard." (Emphasis added).

Second, the Tax Court noted that Hood, Inc. had "no structured system in place" for determining compensation and that Mr. Hood's compensation was set by himself and his wife. "Bonuses that have not been awarded under a structured, formal, consistently applied program generally are suspect . . . ." *Elliotts, Inc.*, 716 F.2d at 1247. Moreover, "salaries

12

paid to controlling shareholders are open to question if, when compared to salaries paid non-owner management, they indicate that the level of compensation is a *function of ownership*, not corporate management responsibility." *Id*. (emphasis added). Thus, the Tax Court's suspicion was enhanced by the fact that in 2015 and 2016, Mr. Hood's compensation represented almost 90% of the total compensation that Hood, Inc. paid to its officers, despite the fact that other non-shareholder officers worked similar hours and shared similar responsibilities. While some of that discrepancy could have been attributed to the need to remedy Mr. Hood's past undercompensation, it was nonetheless glaring that Hood, Inc.'s other officers each received a bonus of $100,000 or less for the 2015 and 2016 tax years, while Mr. Hood received a bonus of $5 million for each year.

Finally, the Tax Court placed considerable weight on the comparison of Mr. Hood's compensation with that paid to similarly situated executives in comparable companies. While no single factor is decisive under the multifactor test, such comparisons have been described as "a most significant factor." *Aspro, Inc. v. Comm'r*, 32 F.4th 673, 680 (8th Cir. 2022) (quoting *Charles Schneider & Co.*, 500 F.2d at 154); *see also* 26 C.F.R. § 1.162-7(b)(3) (requiring consideration of what "would ordinarily be paid for like services by like enterprises under like circumstances"). Relying on survey data included in Fuller's expert report about comparably sized site-preparation contractors and their compensation of employee-shareholders, the Tax Court noted that for the years 2013 through 2016, Fuller treated Mr. Hood as meriting compensation in the 99th percentile based on the company's success and still found that the compensation actually paid to Mr. Hood exceeded what was reasonable. Instead, relying on this comparative data, the Fuller report calculated that

13

reasonable compensation for Mr. Hood would amount to $3,681,269 for 2015 and $1,362,831 for 2016. The Tax Court found these calculations to be "the most credible and complete source of data, analyses, and conclusions." At the same time, the court discounted the testimony of Hood, Inc.'s expert witnesses because they "did not provide satisfactory countervailing evidence . . . that would credibly support a greater allowable amount." It noted, for example, that one of Hood, Inc.'s expert reports based its analysis on survey data for CEO compensation from 2011 to 2016 for companies with a revenue of *up to $500 million*, which, the Tax Court concluded, was a poor match for both Hood, Inc.'s size and the relevant time period at issue.

At bottom, the Tax Court held that a reasonable total compensation for Mr. Hood was $3,681,269 for 2015 and $1,362,831 for 2016, and that a $5 million bonus for each year — on top of his salary — was excessive.

We find that Hood, Inc. has not demonstrated that the Tax Court's factual findings were clearly erroneous or that its reliance on Fuller's report was inappropriate. The court explained its reason for relying on Fuller and rejecting Hood, Inc.'s experts, and we see no basis to disturb that determination. *See United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012) ("Evaluating the credibility of experts and the value of their opinions is . . . a function best committed to the district courts, and one to which appellate courts must defer, and we should be especially reluctant to set aside a finding based on the trial court's evaluation of conflicting expert testimony" (cleaned up)).

14

IV

Finally, Hood, Inc. contends that the Tax Court clearly erred in imposing a penalty for the 2016 tax year. It emphasizes that the Tax Court found that Hood, Inc. had reasonably relied in good faith on its tax advisers when paying the 2015 bonus and that therefore no penalty should be imposed for that year, and based on this finding, it argues that because it relied on the same tax advice for paying the 2016 bonus, the Tax Court should also have found good faith in 2016 and therefore should not have imposed the penalty for that year.

The Internal Revenue Code provides for the imposition of a 20% penalty on "any portion of an underpayment of tax" that is attributable to the taxpayer's "substantial understatement" of income tax liability on its tax return. 26 U.S.C. § 6662(a), (b)(2). Generally, an understatement is substantial if it exceeds 10% of the tax required to be shown on the return. *Id*. § 6662(d)(1)(B)(i). A defense to the imposition of the penalty is provided, however, "with respect to any portion of an underpayment if it is shown that there was a *reasonable cause* for such portion and that the taxpayer acted in *good faith* with respect to such portion." *Id*. § 6664(c)(1) (emphasis added). In determining whether a taxpayer acted with reasonable cause and in good faith, "all pertinent facts and circumstances" must be considered, but "[g]enerally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." 26 C.F.R. § 1.6664-4(b)(1). Whether a taxpayer acted with reasonable cause and in good faith is a question of fact that we review for clear error. *Est. of Kechijian v. Comm'r*, 962 F.3d 800, 810 (4th Cir. 2020).

15

Reliance on the advice of a professional tax adviser has been held to demonstrate reasonable cause and good faith if "(1) [t]he adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." *Neonatology Assocs., P.A. v. Comm'r*, 115 T.C. 43, 99 (T.C. 2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002); *see also United States v. Boyle*, 469 U.S. 241, 250 (1985) ("Courts have frequently held that 'reasonable cause' is established when a taxpayer shows that he reasonably relied on the advice of an accountant . . . even when such advice turned out to have been mistaken"); *Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537, 548 (5th Cir. 2009) ("The validity of this reliance turns on the quality and objectivity of the professional advice which [the taxpayer] obtained" (cleaned up)).

In this case, Hood, Inc. reported an income tax obligation for 2015 of $1,675,996, and the Tax Court found a deficiency of $550,866, which exceeded the 10% threshold for triggering a penalty. Similarly, Hood, Inc. reported an income tax obligation for 2016 of $4,040,956, while the Tax Court found a deficiency of $1,411,991, which again exceeded the 10% threshold for triggering a penalty. But with respect to the 2015 tax year, the court found that Hood, Inc. had established the reasonable-cause defense based on its reliance on the tax advice of two competent and experienced professional accountants at Elliott Davis. The company had provided Elliott Davis with accurate information regarding Mr. Hood's historic compensation and the proposed method of calculating his future compensation, and the two Elliott Davis accountants confirmed that they believed a $5 million bonus for Mr. Hood was reasonable. Yet with respect to the 2016 tax year, the Tax

16

Court found that the evidence was lacking as to what advice the company may have received relating to Mr. Hood's 2016 compensation, observing that this absence of evidence was "particularly notable when considering that the record also does not show that, when awarding Mr. Hood the 2015 amount, [Hood, Inc.] felt Mr. Hood remained undercompensated or that additional backpay compensation might be warranted in the future for these prior services." We conclude, however, that the Tax Court overstated the discrepancy in evidence relating to the two years.

When Hood, Inc.'s CFO provided the backpay calculation to Elliott Davis in May 2015, he wrote, "Bonus due at 5/31/15 is $7,141,000. Pay $5,000,000 5/31/15 *balance to future years*." (Emphasis added). Thus, contrary to the Tax Court's observations, this evidence indicated that Hood, Inc. believed that Mr. Hood would *still be undercompensated* in 2016 following the payment of the $5 million bonus in 2015 and would therefore require additional backpay compensation in the future. Further, several of Hood, Inc.'s witnesses, including accountants at Elliott Davis, testified that they followed the same process to determine the bonus amount in 2016 as they did in 2015, and this fact went uncontroverted. Because the record indicates that Hood, Inc. anticipated remedying Mr. Hood's past undercompensation in installments over multiple years and discussed that plan with its tax advisors at Elliott Davis, who approved it as reasonable, we conclude that the Tax Court's finding regarding the reasonable-cause defense for the 2015 tax year should also have applied to the 2016 tax year.

Accordingly, we vacate the portion of the Tax Court's decision imposing a $282,398 penalty for 2016.

17

V

Mr. Hood's business acumen and his contribution to Hood, Inc.'s prosperity were fully recognized by the Tax Court, and the Tax Court thus concluded that Hood, Inc. was entitled to compensate Mr. Hood well. And we agree.

This case is not about such compensation but rather about whether the amount paid was *entirely for Mr. Hood's personal services* or whether it included profits distributable to him as a function of his ownership of the company. To make that determination, the Tax Court took a multifactor approach designed to measure the portion of compensation that was attributable only to Mr. Hood's personal services and concluded that not all his compensation was so attributable. We now affirm the court's decision with respect to that finding.

Nonetheless, we agree that Hood, Inc. used a consistent methodology to determine the amount of Mr. Hood's bonuses for both 2015 and 2016 with the advice of independent accountants, and therefore, the reasons that the Tax Court gave for not imposing a substantial underpayment penalty for 2015 likewise provided an adequate defense against imposing a similar penalty for 2016.

AFFIRMED IN PART, VACATED
IN PART, AND REMANDED

18